## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## DOCKET NO. 5:04CR18-1-V

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **ORDER** |
| **FREDERICK LAMONT MUNGRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for a New Trial (Document #299); the Government's Response (Document #306); the Government's Supplemental Response (Document #316); the Defendant's Supplemental Memorandum in Support of his Motion (Document #337); and the Defendant's post-hearing Brief in Support of his Motion (Document #346) . This matter is now ripe for disposition by the Court.

Having carefully considered the relevant facts, arguments, and applicable authority, this Court will <u>deny</u> the Defendant's Motion for a New Trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 23, 2005, a jury found the Defendant, Frederick Lamont Mungro ("Defendant"), guilty of one count of conspiracy to possess with the intent to distribute cocaine and cocaine base. Document #227. On April 27, 2006, the Defendant filed a Motion for a New Trial on the grounds of newly discovered evidence. Document #299. In his motion, the Defendant asserted three grounds for a new trial: violations of the Court's sequestration order, the failure of the Government to disclose favorable and

material evidence, and perjury by one of the government witnesses. Def. Mem. 5-10.

The Defendant states that around October 2005, while in Mecklenburg County Jail, fellow prisoner Travis Lee Connor approached the Defendant and informed him that certain government witnesses, namely Jamario Allred, Jermaine Anthony, Carlton Terry, and Fred Shuford, had colluded to testify falsely against the Defendant. Def. Mem. 5. Counsel for the Defendant subsequently conducted interviews of five prisoners, including Connor, who each averred to witnessing essentially the same conduct. Id. at 6-8. In the course of these interviews, the Defendant learned of alleged Brady violations from prisoner Chris Hayes, who had apparently informed the Government prior to trial that he knew of other prisoners who intended to testify falsely against the Defendant. Id. at 8. Defendant also states that the interviews revealed alleged perjury by one of the government witnesses, Jamario Allred. Id. at 9. The Defendant bases his Motion for New Trial upon this evidence.

This Court held four days of hearings to fully examine each of these issues. Having heard the evidence and arguments, and with reference to the Trial Transcripts prepared for it, the Court finds as follows:

## II. DISCUSSION

As stated above, the Defendant moves for a new trial on three grounds under Rule 33 of the Federal Rules of Criminal Procedure. First, the Defendant argues that newly discovered evidence of violations of the Court's sequestration Order merits a new trial. Second, he argues that the Government failed to disclose favorable evidence prior to trial, as it is required to do. Third, he argues that one government witness

2

committed perjury, thus entitling him to a new trial. Although the Defendant proffers all three arguments for a new trial under Rule 33, different legal standards apply to each of these claims, and therefore each will be addressed in turn.

## A. Rule 615 Sequestration Order

Pursuant to Rule 615 of the Federal Rules of Evidence, this Court issued a Sequestration Order on September 13, 2005, the day before the Court impaneled the jury, instructing all potential witnesses not to discuss any matters related to the proceeding. Document #211. The purpose of Rule 615 is to aid the truth-finding process by discouraging and exposing fabrication, inaccuracy, and collusion among witnesses. United States v. Farnham, 791 F.2d 331, 335 (4th Cir. 1986). The Defendant alleges that, after trial, he learned that four witnesses for the Government had discussed the case in violation of this Order.[1] Def. Mem. 5-8; Def. PH Br. 5-7. Based upon this evidence, the Defendant has moved for a new trial under Rule 33 of the Criminal Rules of Criminal Procedure. Def. Mem. 10-15.

Here, unlike most motions under Rule 33, the new evidence claimed by the Defendant is disputed. The four witnesses accused by Defendant of violating the Rule 615 Order have each, under oath, denied this claim.[2] Supp. Resp. 2. Therefore, before determining whether this evidence facially merits a new trial, this Court must first

---

[1]The four Government witnesses accused of violating the Court's Sequestration Order are Jamario Allred, Jermaine Anthony, Carlton Terry, and Fred Shuford. Def. Mem. 5-6.

[2]Government-witness Allred does admit to discussing the "old times" that included the Defendant since he and the Defendant grew up in the same neighborhood. PH Tr. 954-955. However, Allred denies discussing his trial testimony. Id. at 939, 943-946, 949-954, 960-964

3

decide whether the Defendant has presented evidence that a violation of the Court's sequestration order actually occurred.

### 1. Evidence of a Sequestration Order Violation

The Defendant argues that, prior to and during trial, four government witnesses discussed the case and coordinated their testimony against the Defendant. Def. Mem. 5-6. The Defendant contends that he discovered this information when a fellow prisoner (Travis Lee Connor) approached him, unsolicited, and revealed that four government witnesses who testified against the Defendant had coordinated their testimony. Id. Evidence of these alleged violations of the Court's sequestration order consists of affidavits and testimony by five prisoners who, unrelated to the trial of Defendant, were housed with the four accused government witnesses.

The strongest evidence of a sequestration order violation is provided by one of the government witnesses himself. While each of the accused government witnesses generally denies discussing the Defendant's trial, one witness, Jamario Allred, did admit to discussing the Defendant prior to trial. On cross-examination, Allred testified that while he and others did not discuss the case against the Defendant, they did discuss the "old times," since many of them grew up together in East Newton. PH Tr. 954-955; 974-975. Allred maintains that they did not discuss the trial. Id. Allred further denied that their discussion would constitute even background information on the Defendant for someone who was unfamiliar with him. Id. at 955-956. Notably, each government witness denies discussing the case or his testimony against the Defendant. See PH Tr. 472-474 (Terry); 526-527, 531-533 (Anthony); 617-622 (Shuford); 943-946, 950-954

4

(Allred).[3]

All alleged violations of a sequestration order are not alike. To simply utter the name of a defendant that one may testify against to another potential-witness does not constitute a violation of a sequestration order, let alone merit a new trial. Therefore, the Court must determine, based upon the reliability of the evidence, the nature of the conversations that occurred.

Each of the five witnesses relied upon by the Defendant testified that the same four government witnesses coordinated their testimony against the Defendant. However, the testimony of the witnesses proffered by the Defendant varies as to its detail and strength.

The most specific evidence of a violation presented by the Defendant is the testimony of prisoners Tim Davis and Wani Logan.[4] Davis averred that he witnessed all four government witnesses violate the sequestration order. Def. Mem. Attachment Q. Davis testified that, prior to trial, the four-government witnesses gathered together and discussed "scenes" and "transactions" involving the Defendant, and that they would "alter stories, switch information with each other." PH Tr. 740-741. Davis testified that, while in the jail after returning from the trial at the courthouse, the government witnesses would discuss cross-examination questions. Id. at 743-744. Logan testified

---

[3]The questions of counsel and the response of the government witnesses all center on whether or not they discussed the trial, their testimony, or the case against the Defendant. See, e.g., PH Tr. 504 (Anthony noting his instructions not to talk about the case).

[4]The Court notes that prisoner Chris Hayes testified that the four government witnesses coordinated their testimony. PH Tr. 82-84. The Court, however, finds the testimony of Hayes to lack all credibility. See p. 22-25, infra. Consequently, the allegations of Davis and Logan would not benefit from corroboration by Hayes even in the faintest of ways.

5

that he heard Allred and Anthony say that they were each going to "put" two ounces of crack cocaine on the Defendant, meaning that they would falsely attribute certain transactions to him.[5]  PH Tr. 813-814.  This evidence is strengthened by its similarity to the trial testimony of Allred.  See Trial Tr. 474-476 (Allred testifying to buying two ounces of crack cocaine from Defendant).

This evidence, however, is significantly weakened by its lack of specificity and an underlying bias.  Davis acknowledges that he did not hear particular details of any conversation.  PH Tr. 760, 797-798.  The Court also finds the credibility of Logan to be doubtful.  Like the other witnesses for Defendant, Logan also had disputes with Allred. PH Tr. 594-596 (testimony of Fred Shuford).[6]  In addition to having an altercation with Allred and a priest during Bible study, Logan apparently also enjoyed exercising his seniority over the cellblock – a pleasure likely at odds with Allred's "bullying" personality. Id. at 596, 687.  Consequently, while the testimony of Logan is specific to a point, it is not unadulterated.

The testimony of the other witnesses for the Defendant is less compelling. Prisoners Travis Connor and Bon Stroupe only confirm that the four government witnesses "huddled" together, spoke the name of Defendant, and hoped to get their sentences reduced.  Tr. 15-16 (Connor); Tr. 688-689 (Stroupe).  In fact, the averment

_____

[5]The Defendant noted that several days after testifying in the post-trial hearing, Wani Logan was found dead in the Mecklenburg County Jail.  Def. PH Br. 15.  The Court contacted the Jail and received a copy of the Death Certificate, which confirmed that Logan died of natural causes.

[6]The Court finds the testimony of Fred Shuford to be more credible than most because he had little time left on his term of imprisonment, and apparently nothing to gain by his testimony. Moreover, his testimony was calm and unruffled and bore the earmarks of truthfulness.

6

and testimony of Stroupe reveals only that Allred said that he would get his sentence reduced by testifying against the Defendant. Def. Mem. Attachment P; PH Tr. 688. This alone is nothing more than a well-known fact in circulation within the jail: if Allred cooperates truthfully in a government prosecution, he could conceivably receive a motion for a sentence reduction.

The weight of the totality of the evidence of violations of the sequestration order is further weakened by inconsistencies and apparent bias. Connor, the progenitor of this matter, repeatedly testified that he witnessed the four government witnesses exchanging and reviewing documents and photographs about the Defendant to coordinate their testimony. PH Tr. 20, 39, 49. However, all of the other witnesses for the Defendant deny ever seeing any documents in prison, seemingly contrary to their sworn affidavits.[7] PH Tr. 747 (Davis); PH Tr. 874-876 (Logan); PH Tr. 690, 695 (Stroupe); PH Tr. 195, 200 (Hayes).[8] Furthermore, each of the witnesses for the Defendant has had an adversarial relationship with Allred. See PH Tr. 742 (Davis, former cellmate of Allred, did not "get along eye to eye" with him); PH Tr. 687 (Stroupe, cellmates with Allred before a move was requested, referred to Allred as a "bully" who was "always trying to rip somebody off"), 588 (Allred punched Stroupe during a prison fight); 585-594 (Hayes starting a fight with another prisoner in which Allred intervened and broke Hayes's nose); 594-596 (Shuford testifying to Logan's problems with Allred);

---

[7]Travis Lee Connor and Chris Hayes did not sign their affidavits; however both the Government and the Defense did question them about the affidavits at the post-trial hearing.

[8]The Court also finds the credibility of Travis Lee Connor to be doubtful because of his general penchant for untruthfulness, including violations of Court orders, lying to purchase a firearm, and several violations of the terms of his supervised release. PH Tr. 21-32.

56-57 (Connor denying problems with Allred), but see 938 (Allred admitting to bullying Connor). For several reasons discussed below, the Court also finds the testimony of Hayes to be not credible save to the extent it is evidence that the four-government witnesses spoke in a group at the jail. See p. 21-25, infra. Although the general lack of credibility of these witnesses does not render their testimony entirely unbelievable, it does indicate to the Court that these witnesses have a motive to attempt to magnify the importance of the events they actually observed. The Court finds that, at most, the testimony of Connor, Davis, Stroupe, and Hayes shows that the four government witnesses had the opportunity to violate the Court's sequestration order. The credible aspect of this testimony is not evidence itself of a violation.

The Court initially finds that the evidence of sequestration order violation does not implicate government witness Shuford. All witnesses for the Defendant seem to agree that Shuford, while perhaps friends with the other three government witnesses, did not discuss the case or coordinate testimony. PH Tr. 16 (Connor); 187-189 (Hayes); 764 (Davis); 814 (Logan).[9]

Evaluating the remainder of the evidence in its entirety, the Court finds that there is evidence that at least two government witnesses discussed the Defendant prior to and during trial. That evidence indicates that government witnesses Allred and at least one other person discussed knowing and growing up with the Defendant. The Court also finds that government witness Terry discussed a cross-examination question relating to his hopes of receiving a sentence reduction. See PH Tr. 744. The

_____

[9]As noted previously, Stroupe's testimony did not reveal any knowledge of a violation of the Court's sequestration order. See, p. 7, supra.

8

Defendant also points to trial testimony of Anthony that the Defendant alleges morphed as a result of his discussions with other prisoners. For the reasons stated below, however, the Court does not find the evidence offered by the Defendant in support of these allegations to be credible.

Regarding Terry's alleged discussion of cross-examination questions, the Court notes that the veracity of that evidence is tempered by both the impugned credibility of Davis, and by the lack of detail of the questions. It is no revelation that a prisoner, testifying on behalf of the government, will be cross-examined about his interest in having his sentence reduced.[10] Also, questions of this type are not related to the substance of any incriminating testimony, and the impeachment value of such questions cannot be minimized by any coordinated answer. See United States v. Harris, 39 F.3d 1262, 1268 (4th Cir. 1994) (finding no actionable violation where discussions did not involve the substance of their testimony).

Regarding Allred and Anthony, and perhaps Terry, the Court finds that their conversations only tangentially addressed substantive matters related to trial. The Defendant argues that Anthony altered his testimony to include deals with the Defendant and his cousin, Mike Mungro, and to include details about the use of addicts

---

[10] At the outset, the Court observes that the Western District of North Carolina has some of the highest numbers of drug prosecutions in the country, and literally hundreds of inmates occupy county jails at any one time. While a scientific study has not been undertaken, the undersigned can confidently venture, based on the course of nineteen years' experience, that considerable gossip, information, and misinformation is readily available in local jails, both as to legitimate means of obtaining a downward departure and devious means to game the system. Thus, any decision evaluating the substance and nature of events alleged suggesting a violation of a sequestration order must entail an especially careful and discerning review of the testimony and its credibility by the district court.

9

to test the drugs.[11]  First, the testimony about testing the drugs is irrelevant to the

incrimination of the Defendant - the fact that two drug buyers, Anthony and Squarles,

tested drugs of unknown origin is nothing more than a business practice that does not

reflect solely upon the Defendant.  Second, both Anthony and Terry testified to drug

transactions with the Defendant when his cousin was present.  However, as noted

before, this argument does not implicate Squarles, who confirmed drug deals with Terry

and the Defendant only.  Also, as Mike Mungro testified, he knew Anthony because

they grew up together in the area in which Anthony testified to purchasing drugs from

the Defendant.  See Trial Tr. 1303-1304.  The Defendant also knew Anthony.  Id. at

1405.  Neither Terry nor Anthony testified that Mike Mungro played an active part in

these transactions.  Therefore, this evidence does not point to a wholesale fabrication

of testimony against the Defendant.

The testimony of these three government witnesses, aside from this overlap

between Terry and Anthony, addresses independent transactions with the Defendant.[12]

---

[11]Regarding Anthony's testimony about buying drugs from the Defendant at the gym,
defense counsel cross-examined Anthony as to why his recollection changed between his 2003
statement and his trial testimony.  Trial Tr. 680-682.  Although Allred testified to similar
purchases at the gym, Anthony's 2003 statement was given before Allred and Anthony were
housed together.
    The Defendant also argues that Terry and Earnest Squarles coordinated their testimony.
Def. Mem. 4-5.  However, the Defendant does not offer any evidence in the post-trial hearing
implicating Squarles, nor does he raise this issue in the post-trial hearing brief.  Notably, the
Defendant raised concerns about the testimony of Squarles on cross-examination at trial.
Throughout, Squarles' implicated the Defendant as a broker for drug deals.

[12]Government witness Shuford testified at the Defendant's trial, but he did not testify to
dealing with the Defendant in the conspiracy for which the Defendant was convicted.  PH Tr.
615-616.  Defense counsel asked Shuford if a number of prisoners in addition to the three other
government witnesses ever asked him for information regarding the Defendant.  PH Tr. 619-622,
624-625.  While Shuford acknowledged that many fellow-prisoners expressed interest what

10

Generally, any attempt to implicate an otherwise innocent defendant by having several witnesses testify to independent drug deals will stand or fall under its own weight. In other words, no coordination is needed – and thus the sequestration order is not violated – for each government witness to manufacture his own, unrelated story about the Defendant. The evil of coordination only arises in so far as this common detail, Mike Mungro, bolsters the testimony of Anthony and/or Terry.

The most probable violation of sequestration order involved two or more of the accused government witnesses discussing their knowledge of the Defendant from earlier times. The evidence also indicates that these witnesses had the opportunity to discuss the trial, although each denies it. The only substantive overlap is the involvement of the Defendant's cousin.

Since there is some evidence of sequestration order violation, the Court must now analyze that evidence under the <u>Chavis</u> test for newly discovered evidence.

### 2. Sequestration Order Violations under Rule 33

When a defendant moves for a new trial based upon newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure, this Circuit requires conjunctively that: (1) the evidence be newly discovered, (2) the court be able to infer due diligence on the part of the movant, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to the issues involved, and (5) the evidence would probably result in acquittal at a new trial. <u>United States v. Chavis</u>, 880 F.2d 788,

---

happened at trial, he did not speak about his knowledge or relationship with the Defendant. <u>Id</u>.

793 (4th Cir. 1989); see United States v. Rhynes, 206 F.3d 349, 360 (4th Cir. 1999) (applying the Chavis test to a motion for a new trial based upon alleged sequestration order violations); see also United States v. Banks, 1998 U.S. App. Lexis 28029, *3-*6 (4th Cir. 1998) (applying the Chavis test in similar circumstances); but see United States v. Jenkins, 1999 U.S. App. Lexis 8703 (4th Cir. 1999) (applying a prejudice standard to analyze a motion for a new trial based upon an alleged 615 Order violation).[13]  Just as the movant bears the burden of proving all five elements under Chavis, the Defendant also bears the burden of proving that a 615 Order violation occurred.  United States v. Smith, 441 F.3d 254, 267 (4th Cir. 2006).

The Government argues that the Defendant cannot meet three prongs of Chavis, namely that (1) the Defendant did not exercise due diligence in attempting to discover this evidence prior to or during trial, (2) the evidence is merely cumulative and impeaching, and (3) the evidence is not likely to lead to an acquittal.  Resp. 3-4.[14]  For

---

[13]For several reasons, the Court will apply the five-pronged Chavis test rather than a prejudice standard to evaluate the allegations of a 615 Order violation.  First, Defendant moved and argued for a new trial based upon these alleged violations under the Chavis standard.  Def. Mem. 10-15.  Second, published – and thus binding – Fourth Circuit precedent analyzes later-discovered 615 Order violations under the Chavis test, as compared to the non-binding unpublished opinion in Jenkins to which the Defendant alludes.  Def. PH Br. 5.  Further, the facts in Rhynes (disputed evidence of a 615 Order violation) and Banks (disputed evidence of a 615 Order violation) are more similar to this case than those in Jenkins (a witness admitting a violation of a 615 Order).  Third, the Defendant enjoys and has exercised additional post-trial avenues for relief under Brady (improper withholding of exculpatory evidence by the government) and Agurs (witness perjury).  See Sections II.B and II.C, infra.

[14]The Government argues that the Defendant failed to exercise due diligence in discovering this evidence previously.  Resp. 3; Supp. Resp. 3-4.  Although the Defendant did call Troy Powell at trial to testify that Terry had encouraged him to testify falsely against the Defendant, evidence similar to new evidence now alleged, the Court notes that Powell and Terry talked in a prison in Virginia, not in the Caldwell County Jail.  See Trial Tr. 1224.  While the Court would not generally require defense counsel to interview all inmates housed with

12

the following reasons, the Court finds that what evidence there is of a violation of the 615 Order fails the test set forth in <u>Chavis</u> because it is unlikely to lead to the acquittal of the Defendant.

The alleged new evidence proffered by Defendant is not likely to lead to acquittal because it is outweighed by the corroborated, incriminating evidence presented at trial. This case is similar to the Fourth Circuit's unpublished decision in <u>Banks</u>. 1998 U.S App. Lexis 28029, 3-4 (4th Cir. 1998); <u>see also</u> <u>United States v. McCullough</u>, 457 F3d 1150, 1165-68 (10th Cir. 2006) (involving a similar fact-pattern). In <u>Banks</u>, much like the case here, the defendant moved the district court for a new trial based upon information garnered from a fellow prisoner who allegedly observed several trial witnesses discussing their testimony while in custody. <u>Id</u>. at 4. The district court conducted an evidentiary hearing, after which it evaluated the credibility of the witnesses in the context of the standard for granting a new trial.[15] <u>Id</u>. The district court found the testimony of the prisoner-whistleblower to be not credible because of inconsistencies and an ulterior motive for his testimony. <u>Id</u>. at 5. In making this determination on credibility, the court

_____

government witnesses to demonstrate due diligence, the testimony of Powell does provide some notice of the propensity of Terry to engage in such behavior. However, since the Court ultimately finds that the Defendant cannot meet prong five of <u>Chavis</u>, it need not address this issue further.

[15]Although this Court is not engaging in prejudice analysis, it does find that this matter is not one in which prejudice would be presumed, as Defendant has argued. Def. Mem. 14. A presumption of prejudice arose when a request for a sequestration order was *denied* and the Fourth Circuit could not meaningfully evaluate the effect of that omission. <u>United States v. Farnham</u>, 791 F.2d 331, 335 (4th Cir. 1986). Rather, more like <u>Jenkins</u>, prejudice will not be presumed here where the Defendant ostensibly enjoyed the protection of a sequestration order, and was able to call and examine witnesses in an evidentiary hearing regarding alleged violations of that order. 1999 U.S. App. Lexis at *13-*14.

13

held that the evidence was not material and not likely to result in acquittal.  Id.  The defendant appealed this decision and the Fourth Circuit affirmed.  Id. at 6.

Like the court in Banks, this Court made an initial determination as to the credibility of the prisoner-witnesses for the Defendant as it related to the veracity of their claims of sequestration order violations.  See Section II.A.1, supra.  Mostly, this evidence was not credible.  See McCullough, 457 F.3d at 1167 (holding that new evidence that is not credible would not likely lead to an acquittal).  Despite the general lack of credibility, the Court determined that there is some proof of sequestration order violations by prisoners Allred, Anthony, and Terry.  However, the Court does finds that the new evidence of such violations would not be likely to result in an acquittal of the Defendant at a new trial.

Evidence of sequestration order violations draws into question the credibility of witnesses Allred, Anthony, and Terry.[16]  However, the majority of the inculpatory evidence against Defendant was provided by Terry and Earnest Squarles, and it was corroborated by phone records.  Resp. 6; Supp. Resp. n3.  Terry testified to several occasions when he drove to the home-town of the Defendant and the Defendant brokered drug deals between him and others, including Squarles.  See Trial Tr. 173-230.  Terry also testified that he supplied Defendant with drugs to sell personally, and on at

---

[16]Courts enjoy a significant amount of discretion in crafting a remedy to any 615 Order violations.  See United States v. Leggett, 326 F.2d 613, 614 (4th Cir. 1964).  In effect, by holding an evidentiary hearing on the matter and making determinations of credibility in the context of the Chavis test, the Court is employing one of the remedies for sequestration order violations.  See United States v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997) (noting that the three traditional remedies for violations of sequestration are 1) sanctioning the witness, 2) instructing the jury to consider the violation toward the credibility of the witness, or 3) excluding the testimony of the witness).

14

least two occasions, the Defendant was accompanied by his cousin, Mike Mungro. To corroborate those allegations, the Government introduced the cell phone records of the Defendant that include multiple phone calls to Terry throughout the period of time that Terry alleges he was selling drugs with the assistance of the Defendant. Perhaps most importantly, when the Defendant testified, he failed to offer an adequate explanation for the number and frequency of these calls.[17]

Also of significance, the Defendant impeached Terry at trial with evidence similar to the new evidence now claimed. Troy Powell testified that Terry encouraged or solicited him to lie and testify that he bought drugs from the Defendant. Trial Tr. 1226. The Court finds that a reasonable jury had more than sufficient evidence to find the Defendant guilty even in light of this impeachment. While there is evidence of Terry encouraging Powell to lie against the Defendant, Powell did not testify that Terry himself was lying. Furthermore, the impeachment value of a violation of the sequestration order is minimal. The evidence offered by Defendant shows Terry telling a fellow-inmate that he hoped to reduce his sentence by testifying against the Defendant. Evidence of a violation that does not go the substance of or overlap with the testimony now disputed does not merit a new trial. See Harris, 39 F.3d at 1268; United States v. Kosko, 870

---

[17]Defendant explained that he disliked leaving messages, so he would call a person repeatedly until they answered. Trial Tr. 1502. However, this does not explain the timing, frequency, and purpose of those calls. For example, the Defendant called Terry and his cousin numerous times while en route to his honeymoon. After allegedly calling Terry several times before his wedding to ask if Terry would be in attendance, the Defendant explains that he was simply calling Terry afterwards to inform Terry that the wedding occurred. Trial Tr. 1475-1478. The Defendant could not explain why his frequent calls to Terry were accompanied by frequent calls to his cousin. See, e.g., Trial Tr. 1482-1484. The Court finds these phone records to be strongly corroborative and inculpatory evidence.

15

F.2d 162, 164 (4th Cir. 1989); <u>Jenkins</u>, 1999 U.S. App. Lexis at *12 (applying <u>Kosko</u> in a post-trial matter like the one here). This adds little weight, even in the aggregate, to the impeachment of Terry. At best it is merely cumulative and impeaching – grounds that do not merit a new trial.

The evidence of an overlap in testimony between Allred, Anthony, and Terry is also weak. Allred and Anthony testified that they purchased drugs of differing quantities from the Defendant.[18] The Court finds that the trial testimony of Allred and Anthony was vague and subject to impeachment by, <u>inter alia</u>, cross-examination. <u>See</u> Trial Tr. 571-573 (highlighting the doubtfulness of the alleged offer of Defendant to Allred in light of past transactions); 678-682 (highlighting that Anthony did not mention Defendant in his interviews with law enforcement until two years after he began cooperating). Additionally, the overlap in testimony between Anthony and Terry was limited.[19] First, while there is marginally credible evidence of Allred and Anthony discussing the Defendant, there is little credible evidence that Terry and Anthony ever discussed the Defendant. Second, any overlap in their testimony is tangential to the incriminating details supported by the other evidence. Mike Mungro's mere presence at the transactions, though similar, is only incriminating for the Defendant in so far as it goes to

---

[18]Allred testified that the Defendant "fronted" him two ounces of crack cocaine. Trial Tr. 476-477. Anthony testified that Defendant, over three transactions, sold him five-eighths of an ounce of crack cocaine. Trial Tr. 616-622.

[19]Allred and Anthony testified to separate transactions with the Defendant of differing quantities. Even if untrue, the evidence shows that the testimony of Allred remained consistent with what he first told law enforcement in 2003. Trial Tr. 476 (Allred testifying that Defendant fronted him two ounces); PH Tr. 813-814 (Logan testifying that Allred intended to "put" two ounces on Defendant). Therefore, at best, it is not clear if this would be evidence of untruthfulness or jailhouse posturing.

16

their dealing drugs together.  However, Terry only testified to Mike Mungro's presence when *selling* the Defendant drugs.  Anthony testified to Mike Mungro's presence when he *bought* drugs from the Defendant, and Allred testified that the Defendant was alone during their transaction.  The presence of Mike Mungro as a neutral party, if fabricated, does little to incriminate the Defendant as compared to phone records and other, independent evidence implicating the Defendant as a drug-broker.

The balance of the evidence weighs heavily against the Defendant.  The incriminating testimony of Terry, corroborated by other testimony and phone records, was strong.  The evidence of sequestration order violations is weak and adds little impeachment value to witnesses who were already impeached at trial.  Even as the Court strains to examine any potential occurrence of impropriety, it cannot conclude that this new evidence would likely have led to the acquittal of the Defendant.[20]  These three witnesses testified to independent transactions with the Defendant, and to the extent details of the transactions overlapped, those details were either tangential or overwhelmed by corroborative evidence.

---

[20]This finding also includes the quantity of drugs that the jury attributed to the Defendant. The jury attributed fifty (50) grams or more of crack cocaine to the Defendant.  Document #227. Terry testified that his first transaction involving the Defendant included about 2.5 ounces of crack cocaine, or 70 grams. Trial Tr. 191-199.  Terry testified to "fronting" the Defendant 1/3 of an ounce.  Trial Tr. 217.  Only Terry's final two transactions with the Defendant, for one ounce each, included Mike Mungro.  Trial Tr. 225-228.  The Government also presented evidence of several, alternating calls from the Defendant to Terry and to Mike Mungro to support his cousin's involvement.  Trial Tr. 1482-1485.

17

**B. Government <u>Brady</u> Obligations**

   The Government has a constitutional duty to disclose, upon request, evidence favorable to the accused that is material to guilt or punishment.  <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  In order to prove a <u>Brady</u> violation, a defendant must demonstrate that the undisclosed evidence was (1) favorable to the defendant, (2) material, and (3) that the prosecution had the evidence and failed to disclose it.  <u>United States v. Stokes</u>, 261 F.3d 496, 502 (4th Cir. 2001).  This disclosure obligation includes impeachment evidence.  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  Regarding the second element, the Supreme Court has held that undisclosed, favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995) (internal quotations and citations omitted); <u>Stokes</u>, 261 F.3d at 502.  The Court further explained that "a 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial'."  <u>Id</u>. at 434.

   The Defendant argues that the Government was obligated, under <u>Brady</u>, to notify him about the allegations made by Chris Hayes that a government witness intended to lie at trial.  Def. Mem. 8, 16.  The Defendant contends that such a disclosure would have provided additional fodder for the cross-examination of all government witnesses, and also would have spurred the Defendant to seek out others in the custody with similar information, including Dean Weaver.  <u>Id</u>. at 17; Def. PH Br. 8.  The Government responds that the statements of Hayes did not rise to the level that required disclosure.  Resp. 4-5.  Specifically, it argues that although Hayes initially mentioned that several

18

witnesses against the Defendant had discussed the case, upon further questioning Hayes could only identify one individual who he believed would lie at trial. Id. The Government also notes that Hayes could not provide any details supporting this allegation, except to say that he heard about this potential perjury from another prisoner. Id. at 5.

The Government's obligation to disclose its contact with Chris Hayes turns on the second prong of the test outline by Stokes, whether that information was material to the trial of the Defendant. In short, this Court must determine whether the suspicions of untruthfulness relayed by Chris Hayes now undermine confidence in the outcome of the trial. The Court initially notes that the argument raised by the Defendant highlights two distinct types of evidence under Brady: a) the statements of Hayes, and b) evidence that an investigation of these statements might have uncovered through Dean Weaver.

Brady does not create a constitutional right analogous to civil discovery. United States v. Polowichak, 783 F.2d 410, 414 (4th Cir. 1986). A court's review of an alleged Brady violation focuses on the materiality of the evidence as it relates to guilt, not how that evidence affected the ability of the defendant to prepare for trial. United States v. Agurs, 427 U.S. 97, n.20 (1976); Polowichak, 783 F.2d at 414. The Government is under no obligation to provide information on the remote possibility that it may possibly contain or lead to information favorable to the defense. Id. However, although one piece of evidence may not be material alone, if multiple pieces of evidence are involved, the court must evaluate the cumulative effect of all suppressed evidence when determining materiality. United States v. Ellis, 121 F.3d 908, 916 (4th Cir 1997).

For the purposes of the Defendant's argument under Brady, the Court will

19

address both the statements of Chris Hayes and the other evidence uncovered by the Government during its investigation of this matter. The Court will examine the materiality of the evidence individually and cumulatively. Although the Defendant argues that the investigation by the Government should have been more extensive, the Court will not address that matter unless it finds that material evidence would or should have led the Government to investigate further.

### 1. Interview of Chris Hayes

During its preparation for trial, the Government received notice of potential perjury and 615 Order violations from Chris Hayes, a prisoner housed in the same facility in which it was interviewing potential trial witnesses. The Government interviewed Hayes, and on the basis of his accusations, decided to interview other prisoners. At the conclusion of this investigation, the Government chose not to inform the Defendant of the interview with Hayes or its subsequent investigation of the matter. The Defendant asserts that this failure constitutes a Brady violation. As noted previously, the Government is not obligated to disclose any and all information related to a criminal prosecution. So, by not turning over such material, the Government implicitly indicated its belief that the evidence did not qualify under Brady as being material to the guilt or punishment of the Defendant. In order to determine the validity of that assessment, this Court must closely examine the nature of the evidence in dispute.

While conducting pre-trial interviews at Caldwell County jail in late summer or early fall, the Government decided to interview prisoner Hayes after he had informed it

that he had information about the Defendant's trial.[21]  The Government and Hayes

disagree about the timing and number of their meetings,[22] but the relevant matter is the

substance of those meetings.  Agent Woodward testified that Hayes initially stated that

several people were fabricating testimony and talking about the Defendant's trial.  PH Tr.

252, 283.  However, Agent Woodward noted that, when AUSA O'Malley pressed Hayes

for specific details about these allegations, he "had no specific information."[23]  PH Tr.

---

[21]The Government and Hayes disagree about how this meeting was prompted.  Hayes contends that the Government initially met with him after he contacted Agent Woodward on a three-way call via his mother.  PH Tr.  85.  The Government contends that the initial meeting was a result of a note that Hayes sent to them through another interviewee.  PH Tr. 282-283.  Regardless, the means by which the meeting/s were prompted is irrelevant to the Brady issue.

[22]The Government and Hayes disagree as to the dates and number of meetings that they had.  Hayes contends that the first meeting occurred four-to-five months prior to trial (April-May 2005).  PH Tr. 85-86.  Hayes further contends that he sought a second meeting two weeks before trial but was rebuffed.  Tr. 88.  He states that his second/final meeting with the Government occurred after trial, in preparation for this evidentiary hearing.  Tr. 89.

The Government contends that its first meeting with Hayes occurred during its trial preparation in the late summer of 2005.  Tr. 249.  Agent Woodward stated that during this time, Hayes sent a note to him through another prisoner requesting to meet.  Tr. 250-251.  Pursuant to that note, Agent Woodward and AUSA O'Malley interviewed Hayes, at which point Hayes stated that he had heard people discussing the Defendant's trial.  Tr. 282-283.  Based upon this information, Agent Woodward stated they interviewed Hayes again at the subsequent round of trial preparation.  Tr. 284.  During this interview the Government asked Hayes to detail his claims, and as a result, the Government then interviewed Fred Shuford to confirm what Hayes had stated.  Tr. 285-286.

The Court finds the time-line of the Government to be more credible than that of Hayes.  With Hayes's proclivity to call Agent Woodward two or three times a week requesting a meeting, from the beginning of his incarceration in March 2005 through the Defendant's September trial, it is more plausible that Hayes mistakenly associated one of those many calls with his meeting.  Tr. 266.  Furthermore, it is more likely that Agent Woodward and AUSA O'Malley were preparing for the Defendant's September trial in late summer 2005, rather than April-May 2005.

[23]During direct examination, the Defendant confronted Agent Woodward with his affidavit prepared for this evidentiary hearing.  Upon questioning, Agent Woodward acknowledged that he recalled Hayes informing him and AUSA O'Malley of "a pattern of others" who had "frequently talked about the upcoming Mungro trial and compared discovery

251; Resp. 5. Agent Woodward explained that Hayes claimed that fellow-prisoner Dean Weaver would commit perjury. PH Tr. 285. When asked for justification, Hayes further explained that he believed that Weaver would lie about the Defendant because another prisoner, Fred Shuford, told him that Weaver did not know the Defendant. PH Tr. 285. The Government subsequently interviewed Fred Shuford, who confirmed his belief that Weaver could not know anything truthful about the Defendant. PH Tr. 285-286.

Hayes testified that, during his interview and contrary to what the Government contends, he told Agent Woodward and AUSA O'Malley that "three people ... Sherwood Gaither, Dean Weaver, and Christopher Mack Cody ... were going to commit perjury and lie to be able to be in the case against Fred Mungro." PH Tr. 87. Hayes then stated that, had the Government interviewed him just prior to trial, he would have relayed information that he discovered through three other inmates (including Terry and Shuford), that Jermaine Anthony and Jamario Allred intended to lie. PH Tr. 89-90. Finally, Hayes claims that Allred later battered him when Allred discovered that Hayes had been talking to the Government about him. PH Tr. 93.

The contrast in testimony between Agent Woodward and Hayes, namely what details Hayes offered during his interview, is ultimately a question of credibility.[24] The Court finds that for several reasons, the testimony of Hayes regarding his statements to

---

and testimony." Tr. 256. However, Agent Woodward amplified this answer by explaining that, when pressed for specific details about this pattern of widespread activity, Hayes remained unable to provide any specific information upon which he could act. Id. at 256-257.

[24]For the information provided by Hayes to be material, it must be credible. Otherwise, mere accusations would be sufficient to trigger the Government's Brady obligations, a premise rejected by the case law. See Agurs, 427 U.S. at n.20; Polowichak, 783 F.2d at 414.

the Government is not credible, and that the testimony of Agent Woodward accurately describes the nature and contents of its interview with Hayes.

Chris Hayes has a poor reputation and character for truthfulness. Facing a federal sentence of up to sixty-five years, Hayes has a demonstrated zeal to cooperate, sometimes at the expense of the truth. While incarcerated, Hayes contacted law enforcement agents two or three times weekly to offer his assistance in an effort to reduce his sentence and/or to get out on bond. PH Tr. 266 (Agent Woodward); 902 (Agent Ford). The courts, fellow prisoners, and Hayes himself have each recognized his desire to do any and everything to reduce his sentence or to receive bond. PH Tr. 121-123, 125 (to this Court and Magistrate Judge Horn); 102 (Hayes about himself); 409-412 (Weaver);[25] 598 (Shuford).

Specifically, Hayes has proven untruthful in his cooperation with the Government in the past. While cooperating with the Government prior to his incarceration, agents discovered that Hayes had been violating the law, contrary to the terms of his bail and his cooperation agreement, by buying/selling drugs and misusing government money. PH Tr. 263, 268-270. Furthermore, once incarcerated, Hayes continued to be untruthful in his attempts to cooperate with the Government. Although he had no real evidence, Hayes told Agent Ford that he knew of several bodies buried on a particular property. PH Tr. 898-899. Months later, after the government had not acted on this information, Hayes then relayed that he had personally seen approximately fifteen shallow graves on

---

[25]Hayes lied to Weaver when the two later became cell-mates. Weaver soon realized that the Government did not call him at trial because someone had warned the Government, and after expressing this concern to Hayes, Hayes blamed Shuford and Allred. Tr. 407, 416, 419.

that property.  PH Tr. 899-901.  A subsequent investigation revealed no such graves. PH Tr. 902.

In addition to his penchant for untruthfulness, Hayes possesses an ulterior motive to testify on behalf of the Defendant.  While in prison, and prior to the Defendant's trial, Jamario Allred broke Hayes's nose in a fight.  PH Tr. 226-231 (Hayes's version); 585-594 (Shuford's version).  Although Hayes claims that Allred hit him in retaliation for talking to the government about suspected perjury, equally plausible alternative explanations exist.[26]  Hayes and others, including Bon Stroupe, initiated a fight with another prisoner who had apparently stolen cigarettes from an older inmate.  PH Tr. 586-587.  During this confrontation, in which Hayes struck the man from behind, Allred, who was friends with the man that Hayes punched, intervened and punched Hayes.[27] PH Tr. 591-593.  Even assuming that Allred struck Hayes because of his interview with the Government, that event alone is not evidence of Hayes's truthfulness or Allred's potential perjury.  Rather, it is equally plausible that Allred planned to testify truthfully and he was angered by Hayes's attempts to undermine that opportunity for his own benefit.  Presented with little evidence beyond surmise, this Court cannot find that the fight between Hayes and Allred constitutes evidence of nefarious activity implicating Allred.

_____

[26]Hayes also acknowledges that he angered Allred by refusing to share Agent Woodward's cellphone number with him.  Tr. 93.  Allred confirms this dispute.  Id. at 967.

[27]As perhaps a lesson in "How Not to Conduct a Prison Fight," Hayes decided to poll the general population of Block 324 in Caldwell County jail to gauge the likely response to his disciplining the alleged cigarette thief.  Unbeknownst to Hayes, Allred was friends with the alleged thief, and thus Hayes's survey unfortunately revealed his intentions and the strategy of his attack.

24

As demonstrated by the substance of the information and the manner in which he shared it, Hayes is willing to play fast and loose with the truth. First, at Hayes's own admission, he was merely sharing with the Government the alleged thoughts and opinions of other prisoners. This hearsay evidence, especially filtered through Hayes's self-serving motives, carries little weight. Shuford himself denies that he ever spoke to Hayes about Weaver and the Defendant; rather, Shuford claims to have generally warned Hayes about Weaver's manipulative behavior. PH Tr. 626, 629-631. The Court finds the testimony of Shuford to be more credible on this point. See Footnote 6, supra. Furthermore, the accuracy of the information provided by Weaver was always in doubt. Agent Woodward confirmed that the Government believed that Weaver could testify only against one of the other defendants in the trial, not Defendant Mungro.[28] PH Tr. 277, 281; see also PH Tr. 314, 366 (Weaver confirming that he was never supposed to testify against Defendant). Hayes's testimony that, if interviewed later, he would have revealed the misdeeds of Allred, Anthony, Shuford, and Terry, rather than the names of the three other individuals he named before, seems to be little more than a convenient elaboration. Rather, the fact that Hayes abandoned his original accusation for one that

---

[28]The Defendant argues that the Government planned to call Weaver against him until the revelations of Hayes. Def. Mem. 16-17; Def. PH Br. 8. However, that assumption was mistaken. While the Government argued that Weaver was a questionable witness prior to the revelations of Hayes, the testimony of Lt. Woodward clarifies that the Government never intended to call Weaver to testify against the Defendant. Resp. 5; Tr. 277, 281, 314. Lt. Woodward confirmed that Weaver had only talked to the Government about co-defendant Russell Powell. Tr. 277. He noted that once they informed Weaver that Powell had pled guilty, thus leaving no need for Weaver's testimony, Weaver then said that he had information regarding co-defendant Bonds. Tr. 280-281. This new information, which Weaver had previously not disclosed, aroused the suspicions of the Government and caused them to question his truthfulness. Tr. 281-282. Weaver was never slated to testify against the Defendant.

25

now conveniently fits with the accusations of others lends further weight to his impeachment.

Thus, the Court finds the testimony of Agent Woodward regarding the substance of the interview with Hayes to be more credible. From that interview, the Government knew and confirmed that Dean Weaver was not likely to be truthful. However, the untruthfulness of Weaver, as the Government understood it, had no direct relevance to the trial of Defendant. Even affording some weight to the testimony of Hayes is unavailing. See Agurs, 427 U.S. at n.21 (noting that if there is sufficient evidence supporting the conviction, and the alleged material evidence is both insubstantial and subject to impeachment, than that evidence is likely not material). The crux of the Government's case against the Defendant rested on Terry, Quarles, and cell-phone records. See, Section II.A.2, supra. In fact, Hayes himself, through the same type of hearsay evidence that the Defendant now clings to, confirms that the Defendant brokered drug deals for Terry. PH Tr. 191-193, 244. For these reasons, the information offered by Hayes about Weaver, now revealed, does not undermine confidence in the verdict of the jury.

26

**2. Dean Weaver**[29]

The Defendant contends that, had the Government informed him of Hayes's statements, Defense counsel would have discovered additional exculpatory evidence by way of Weaver. Def. PH Br. 8. However, the Defendant conflates the basis for discovering Weaver with the testimony that Weaver later provided. The Defendant also exaggerates the evidence that likely would have resulted from such pre-trial notice.

The Defendant describes two types of exculpatory evidence that it believes flowed from the interview with Hayes. The first piece of evidence is Hayes stating that certain witnesses would perjure themselves. Def. PH 8. This claim is addressed in the next section of this Order. Second, the Defendant argues that the statements of Hayes would have led to an investigation of Dean Weaver. Def. PH Br. 8. The Defendant believes that, in such an interview, Weaver would have revealed facts similar to those in his post-trial letter, namely the improprieties of potential government witnesses.[30] Def. PH Br. 9.

_____

[29] The Defendant argues that the Government has confused its obligations under the Jencks Act with those required under Brady. Def. Mem. 17; Def. PH Br. 9; see also Resp. 5 (arguing that "since Weaver was not called to testify ... there was no Brady/Giglio violation"). Even if this were so, the Court notes that the constitutional obligations due defendants are not measured by the beliefs of the prosecutor. Agurs, 427 U.S. at 110. Therefore, even if the Government construed its obligations regarding Weaver under the Jencks Act, which is in doubt since it never took any statements from Weaver, that does not detract from the ability of this Court to evaluate that evidence under the materiality standard of Brady. Whether intended or not, the decision of the Government to not disclose this evidence to the Defendant classifies it as falling below the Brady threshold, and thus this matter merits review under that same standard.

[30] Weaver's letter does not qualify as Brady material because it was written after trial. See Stokes, 261 F.3d at 502 (requiring proof that the prosecution had the evidence and failed to disclose it _prior_ to trial to prove a Brady violation). To the extent that the letter might support additional claims raised by the Defendant, the Court will look to the testimony of Weaver from the post-trial hearing.

The premise of the Defendant's argument is flawed. As noted previously, the Government is not obligated to disclose information on the remote possibility that it may contain or lead to information favorable to the defense. United States v. Agurs, 427 U.S. 97, n.20 (1976); Polowichak, 783 F.2d at 414. The requirement for disclosure is triggered only when the evidence is material to guilt or punishment. Brady, 373 U.S. at 87. Here, after its interview with Hayes and Shuford, the Government determined that its Brady obligation was not triggered - that the evidence from the interviews was not material to the guilt or punishment of the Defendant since it only implicated a witness who would not testify against the Defendant.[31] The interview with Hayes did not provide the Government with any grounds to suspect that Weaver knew of any other witnesses who acted improperly; it only gave them notice, which they confirmed, that Weaver was not a credible witness. Therefore, the Government never possessed this evidence, as is required to prove a Brady violation. See Stokes, 261 F.3d at 502 (requiring proof that the prosecution had the evidence and failed to disclose it). Any attempt to portray the testimony of Weaver as Brady material is incorrect because, based upon the evidence provided by Hayes, clairvoyance alone would have led the Government to Weaver.

Furthermore, the Defendant's argument that Hayes's statement would have led it to investigate Weaver, or any other prisoners, is speculative at best. The argument is a non-sequitor because, had the Government shared the claims of Hayes with the Defendant, the Defendant would have been on notice only that Weaver intended to lie

---

[31]Neither the Government nor Weaver ever indicated that Weaver would testify against the Defendant. Tr. 277, 281 (Lt. Woodward); Tr. 314, 366 (Weaver). Rather, Weaver would have testified only against another defendant on trial with Defendant Mungro. Id.

28

against him at trial.  It is not clear that this information would have spurred the Defendant to then interview Weaver, and it is even less clear that Weaver would have then revealed other prospective perjurers.  This argument also depends upon the troubling contradiction of having the Court find that Hayes accurately described Weaver as an intended perjurer, and then having the Court find that Weaver would have truthfully relayed information regarding other potential perjurers.

However, even accepting the contention that the Defendant would have then interviewed Weaver, it is unlikely that the interview would have led to the discovery of the information that Weaver included in his January 2006 letter.  Def. PH Br. 9. Weaver's pre-trial knowledge of any improprieties was spotty at best and unbelievable at worst.  Weaver testified that, through prison chatter, he heard that Allred and Anthony were lying about their interactions with the Defendant.  PH Tr. 323, 326.  As far as non-hearsay evidence, Weaver also testified that Allred "kept switching his story up," at one time admitting to dealing drugs with the Defendant and at another time denying it, although Weaver could admittedly never prove it.  PH Tr. 324-325, 395.  Ultimately, whether this is even true, let alone material, is a question of credibility.

Finally, even if the interview did lead to the information that Weaver described in his January 2006 letter, the Court finds that Weaver is not credible, and thus the evidence that Weaver might have provided is not material.  During his testimony, Weaver appeared to be generally untruthful and inconsistent.  When pressed to describe his pre-trial knowledge of any improprieties, Weaver stated that he told Lt. Woodward and AUSA O'Malley that Allred had denied dealing with the Defendant.  PH Tr. 397-398.  Not only does Lt. Woodward contradict this, but Weaver later testifies that

29

he made no efforts to brings his concerns about the Defendant to light prior to his January 2006 letter. PH Tr. 277-282 (Woodward noting that the Weaver interview addressed the other two defendants); 425-426 (Weaver). Weaver also testified that he told Lt. Woodward and AUSA O'Malley that Anthony and Allred were smoking marijuana in prison, however Lt. Woodward denies this because he would have been duty-bound to have reported it. PH Tr. 428, 566.[32] Finally, Weaver also demonstrated his willingness to stretch the truth if the proper circumstances presented themselves. PH Tr. 352 (admitting willingness to give a false statement).

Specific to this matter, Weaver had a clear bias concerning the prisoners whom he now accuses of improprieties. Weaver admitted that he was upset that he was unable to testify, and thus qualify for a further sentence reduction. PH Tr. 359, 405-407. His frustration only grew when two of the defendants had retrials, and the Government again did not call him as a witness. PH Tr. 424-425. Although the Government decided not to call Weaver on account of its own doubts, bolstered by Hayes, Hayes told Weaver that Shuford and Allred were the ones who scuttled his opportunity to testify by telling the Government that he would lie. PH Tr. 405-407, 418-420. Additionally, Weaver had developed an adversarial relationship with Allred as competing jailhouse barbers.[33] PH

---

[32]In cross examination, the Defendant questioned whether Lt. Woodward could distinguish Weaver from other inmates. Tr. 566. Lt. Woodward admitted that he could not identify Weaver, but he did affirm the general demeanor (placing feet on the table, imitating an agent) of a witness believed to be Weaver. Tr. 278. Weaver testified that during his pre-trial interview, he acted in the manner described by Lt. Woodward. Tr. 351.

[33]Weaver suspiciously denied an adversarial relationship with Allred even before he was questioned about it. On direct examination by defense counsel, in response to a question about a conversation he had with Allred, Weaver randomly noted that he "never showed no animosity towards this guy [Allred] at all ... me and him has never argued or nothing ... and there was no - it

30

Tr. 225 (Hayes); 460 (Terry); 584-585, 601 (Shuford). Hayes used this particular dispute to needle Weaver as he explained why Allred and Shuford told the Government that Weaver was lying. Tr. 406-407, 416, 420. This gives Weaver a specific motive to be untruthful about the actions of these prisoners which, when coupled with his general proclivity for untruthfulness, gives this Court little comfort with his credibility.

Since the Court does not find the testimony of Weaver to be credible, it cannot find it to be evidence material to the trial of the Defendant. See Footnote 23, supra. As noted previously, the jury convicted the Defendant based upon corroborated and unexplained evidence that he was involved, albeit briefly, in drug deals with Terry. Furthermore, the Government notes that the testimony of Allred was significantly impeached at trial, leading this Court to determine that it held little incriminating value. Resp. 6; United States v. Avellino, 136 F3d 249, 257 (2d Cir. 1998) (holding that undisclosed evidence further impeaching an already impeached witness is cumulative, and thus not material). Consequently, the Court finds the testimony of Weaver to be equally unavailing and immaterial.

### 3. Cumulative Evidence

When evaluating an alleged Brady violation, the Court must evaluate the cumulative effect of all suppressed evidence when determining materiality. Ellis, 121 F.3d at 916. Determining the cumulative effect of this evidence is a less daunting task since it is so intertwined. As note before, proof of a Brady violation must be based upon

---

was never a personal vendetta between both of us that I know of." PH Tr. 328. This unwarranted response casts further doubt on the credibility of Weaver's accusations.

the evidence before the Government prior to trial - namely its interview with Hayes. For the reasons noted above, the interview of Hayes was not material to the guilt or punishment of the Defendant, and thus the Government was not required to disclose that information. Although the testimony provided of Weaver does not qualify as Brady material per se, in an abundance of caution, this Court has also examined that evidence the Defendant contends he would have discovered had he been given notice of Hayes's interview. Even viewed together, the testimony of Hayes and Weaver lacks credibility and thus is not material to the guilt or punishment of the Defendant. Although the Defendant argues that his trial strategy would have benefitted from this evidence, the Court reminds that a Brady analysis focuses on the materiality of that evidence, not how it affected the Defendant's ability to prepare for trial. See Agurs, 427 U.S. at n.20.

**C. Government Agurs Obligation**

When previously undisclosed evidence allegedly reveals that the Government introduced testimony that it knew or should have known was perjured, the Supreme Court has applied a different standard than it applies to alleged Brady violations. Since "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair," the Court held that such a result "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 271 (1959)); United States v. White, 238 F.3d

Case 5:04-cr-00018-RLV-CH   Document 358   Filed 05/13/08   Page 32 of 37

537, 540-541 (4th Cir. 2001).[34]

The Defendant contends that government witness Jamario Allred committed perjury by falsely testifying that the Defendant sold him drugs. Def. Mem. 18; Def. PH Br. 12.[35] In support of this allegation, the Defendant offered the testimony of prisoners Dean Weaver, Wani Logan, Chris Hayes, and Tim Davis.[36] Defendant argues that several of these witnesses overheard Allred stating that he intended to lie against the Defendant at trial, and further that Allred admitted to Weaver after testifying that he did lie. Def. PH Br. 14-16. Allred denies committing perjury. PH Tr. 939.

Much like the alleged violations of the sequestration order, the Court must first determine the existence or credibility of the perjury allegations before evaluating their

_____

[34]The Agurs "affected the judgment of the jury" standard differs in form from the Brady "reasonable probability that ... the result of the proceeding would have been different" standard. While other Circuits have recognized and analyzed the implications of this distinction, the Fourth Circuit has expressly reserved doing so. See United States v. Cargill, 1998 U.S. App. Lexis 1407, *15-*16 (4th Cir. 1998) (unpublished) (citing United States v. Kelly, 35 F.3d 929, n.10 (4th Cir. 1994)).

The Court also applies the Agurs standard rather than the standard for a witness's recantation of testimony. See United States v. Lofton, 233 F.3d 313, 318 (4th Cir. 2000); United States v. King, 71 Fed. Appx. 192, 195 (4th Cir. 2003) (refusing to apply the recantation standard where the witness did not actually recant). Here, the alleged perjurer Allred has not recanted his testimony. Furthermore, the Agurs standard imposes a lesser burden on the Defendant.

[35]In his post-hearing brief, Defendant seemingly expands his allegations of perjury to include other government witnesses. See Def. PH Br. 15-16. However, the Court finds that the Defendant has only alleged perjury, and provided evidence in support, with regard to Allred. The other, implicit allegations raised by Defendant in his post-hearing brief refer to the coordination of testimony, which the Court has addressed previously in this Order. See, Section II.A, supra.

[36]The Defendant also cites the testimony of Bon Stroupe, who stated that Allred told him how one would commit perjury. Def. PH Br. 15-16. Stroupe also testified that, after trial, Allred bragged that he "burned" someone and expected to receive a sentence reduction for his testimony. PH Tr. 688. Although not direct evidence of perjury, the Court does take note of this testimony as circumstantial evidence regarding Allred. The Court also evaluated this testimony in light of its previous concerns about Stroupe's credibility. See, p. 6-7, supra.

33

effect, if any, on the jury. Weaver testified that he had conversations with Allred concerning the Defendant both prior to and after trial. Prior to trial, when Weaver and Allred were cellmates and Allred had been smoking marijuana, Weaver testified that Allred stated that the Defendant never sold him drugs. PH Tr. 324-325. Weaver further testified that, after trial, Allred told Weaver that he disliked "lying on [Defendant]." Id. at 328-329. Other accusers seemingly confirmed this pre-trial conduct. Logan testified that Allred stated that he intended to "put" two ounces of crack cocaine on the Defendant, implicitly meaning that this would be a fabrication. PH Tr. 813. Hayes was told by Shuford that Allred was lying about the quantity of drugs he received from the Defendant. PH Tr. 185-186, 217. Davis testified that Allred likely lied at trial because he observed other inmates feeding Allred information about the Defendant. PH Tr. 762.

The accusations of perjury are mitigated by their respective lack of credibility. First, the testimony of Weaver is somewhat incredible on its face. Weaver testified that, unsolicited, Allred outright confessed prior to trial that he intended to lie, and confirmed after trial that he did in fact lie. Interestingly, Weaver had previously declared to his entire cellblock, including Allred, that he would turn anyone in he discovered to be lying. PH Tr. 408. Also, since at that time Allred and Weaver were in different cellblocks, Allred's post-trial confession to Weaver occurred during a haircut in the hallway between cellblocks. PH Tr. 392. Therefore, the testimony of Weaver is that despite his publicly announced willingness to turn in perjurers, Allred approached Weaver after trial and simply confessed in public to perjuring himself.

Second, and significantly, Weaver had a clear and strong bias against Allred. As noted previously, Weaver believed that Allred prevented him from testifying at trial, and

34

thus prevented him from receiving a sentence reduction. PH Tr. 405-407, 418-420. Weaver was admittedly angry about this. Tr. 359, 405-407. This anger stems from, and is perhaps exacerbated by, Weaver's competition with Allred over the job of prison barber. See PH Tr. 225 (Hayes); 460 (Terry); 584-585, 601 (Shuford). Hayes, who falsely told Weaver that Allred, inter alia, convinced the government to not use Weaver as a witness, told Weaver that Allred did so because of the barbering dispute. PH Tr. 407, 416. This evidence of bias casts great doubt upon the truthfulness of Weaver's testimony. See also Section II.B.2, supra.

Regarding the remaining witnesses (Logan, Hayes, and Davis), their testimony of Allred allegedly committing perjury is particularly weak because it is largely speculative, lacks detail, and suffers from their own biases. For example, Davis testifies that Allred is lying because he did not know the Defendant, so others had to feed him information. PH Tr. 798. However, the Defendant and Allred did know each other because, as the Defendant admits, they had dealt drugs together prior to Defendant's first incarceration. Trial Tr. 1402. Furthermore, the testimony of Davis is contradicted by the testimony of Logan where Logan states that Allred was feeding Anthony information. PH Tr. 816.

As previously noted, the Court has also found the testimony of Hayes to lack credibility. Hayes has leveled charges of perjury or collusion against every witness in this case, including the law enforcement officers. For the reasons explained before, the Court does not find the testimony of Hayes to be credible. See, Section II.B.1, supra. Regarding Logan, the Court has already found that his testimony, in addition to being weak, also lacks credibility. See, p. 6-8, supra.

The claim of perjury is further diminished by the consistency of the testimony by

35

Allred.  After his indictment in 2003, Allred provided law enforcement with a list of names of fellow drug dealers, and this list included the name of the Defendant and described a deal for two ounces of crack cocaine.  PH Tr. 972-973.  This is precisely what Allred testified to at the trial of Defendant.  Allred had known the Defendant, and the Defendant admits to dealing drugs with him prior to the indictment.

The Court finds that the allegations of perjury by Allred substantially lack credibility.  Furthermore, the testimony of Allred at trial was both tangential and impeached.  The crux of the case against Defendant came by the way of testimony by Terry, cell-phone records of the Defendant, and the inability of the Defendant to explain away his connections, in violation of the terms of his supervised release, with Terry. Therefore, the Court does not find that the evidence of Allred's alleged perjury would have affected the judgment of the jury.


## III. CONCLUSION

The Court takes note of the circumstances in which these allegations have come to light.  As one government witness noted, there was "a lot of strife going on in the pod." PH Tr. 511 (Anthony).  By his own account, government witness Allred appears to have offended most people in the cellblock.  PH Tr. 939, 954.  In accordance with the analysis of the Supreme Court in Agurs, the Court will not grant the Defendant a new trial based upon any and all allegations levied against government witnesses.  To adopt a more relaxed standard would only encourage unfounded "finger-pointing" by prisoners and impede the search for truth.  See McCullough, 457 F.3d at 1167-68.  Rather, the Court must evaluate the new evidence alleged by Defendant under the strictures for the

grounds upon which the motion has been brought, namely the standards set forth in Chavis, Brady, and Agurs. The Court has done this. After carefully listening to four days of testimony during a post-trial hearing in a concerted effort to determine the truth of this matter, it is clear that the grounds for a new trial do not exist.

For the foregoing reasons, this Court will deny the Defendant's Motion for a New Trial.

**IT IS HEREBY ORDERED** that the Defendant's Motion for a New Trial be **DENIED**.

Signed: May 13, 2008

Richard L. Voorhees
United States District Judge